UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

In re:

                                                       Chapter 13

Vilma Louise Johnson,

                                                       Case No.: 22-41100-jmm

                              Debtor.

----------------------------------------------------------------x

Zev Cadaner,

                                  Plaintiff,

                           v.                              Adv. Pro. No.: 22-01070-jmm

Vilma Louise Johnson, Chaya Shusterman,
Eliezer Lever,

                                Defendants.

----------------------------------------------------------------x

## **MEMORANDUM DECISION**

| | | |
|---|---|---|
| Bronstein, Gewirtz & Grossman, LLC | McKinley Onua & Associates, PLLC | Brief, Carmen & Kleiman, LLP |
| Edward N Gewirtz, Esq. | Nnenna Okike Onua, Esq. | Ira Kleiman, Esq. |
| 60 East 42nd Street, Suite 4600 | 26 Court Street, Suite 300 | 488 Madison Avenue |
| New York, NY 10165 | Brooklyn, NY 11242 | New York, NY 10022 |
| chona@bgandg.com | nonua@mckinleyonua.com | ik@briefjustice.com |
| *Counsel for Plaintiff, Zev Cadaner* | *Counsel for Defendant, Vilma Louise Johnson* | *Counsel for Defendants, Chaya Shusterman and Eliezer Lever* |

## **INTRODUCTION**

This decision addresses which of two real property contract vendees is entitled to purchase the debtor's real property. Vilma Louise Johnson contracted to sell her home to Eliezer Lever. Lever assigned his right to purchase the property to his wife Chaya Shusterman. Lever and Shusterman failed to close on the sale timely. Johnson moved on and contracted to sell her home to Zev Cadaner. Lever and Shusterman learned of Johnson's contract with Cadaner and recorded a memorandum of assignment of the Lever/Shusterman contract.

Cadaner then commenced an action in New York Supreme Court against Johnson, Shusterman, and Lever. Among other things, Cadaner sued Johnson for specific performance and for money damages for breach of contract. Johnson counterclaimed for declaratory judgment that the Cadaner contract was void due to Cadaner's breach of contract. Shusterman and Lever asserted crossclaims against Johnson for declaratory judgment that the Lever/Shusterman contract was enforceable, specific performance, and for money damages for breach of contract.

Cadaner, on the one hand, and Shusterman and Lever, on the other hand, asserted claims against each other for tortious interference.

After Cadaner commenced the action in state court, Johnson filed a voluntary petition for relief under chapter 13 and removed the state court action to this Court. Johnson filed a chapter 13 plan rejecting the Cadaner contract and assuming the Lever/Shusterman contract. Despite proposing a chapter 13 plan that provides for Johnson to assume the Lever/Shusterman contract, Johnson now claims Lever and Shusterman materially breached the contract by failing to timely obtain a mortgage commitment, and that Johnson terminated that contract prepetition.

The Court finds that neither Johnson nor Cadaner breached the Cadaner contract and neither party took the steps necessary to terminate the Cadaner contract.  Cadaner is entitled to declaratory judgment that the Cadaner contract remains in full force and effect.  Cadaner's claims for money damages for breach of contract and a return of the good faith downpayment are not ripe.  If Johnson confirms a plan that rejects the Cadaner contract, Cadaner may be entitled to damages for breach of contract and the return of the downpayment.  However, Johnson is entitled to amend her chapter 13 plan prior to confirmation.  Considering this decision, Johnson may determine to amend her plan to assume the Cadaner contract.  If Johnson confirms a plan that assumes the Cadaner contract, then Johnson and Cadaner would proceed to close the sale under the contract terms and Cadaner would not be entitled to damages or a return of the good faith downpayment.

As an aside, Cadaner would not be entitled to specific performance even if Johnson were to reject the Cadaner contract.  Under Bankruptcy Code sections 101(5) and 365(i), if a debtor rejects a contract to sell real property, the vendee is not entitled to specific performance unless the vendee is in possession of the property.  11 U.S.C. §§ 101(5) & 365(i).  Cadaner is not in possession of Johnson's real property.

The Court finds that Johnson properly terminated the Lever/Shusterman contract prior to the commencement of this case.  Lever and Shusterman failed to obtain a mortgage commitment and failed to terminate the contract.  Therefore, Lever and Shusterman are not entitled to specific performance or money damages and Johnson is entitled to retain the good faith deposit.

Cadaner's, Lever's and Shusterman's claims for tortious interference are not related to Johnson's bankruptcy case because there is no possibility that those claims will affect Johnson's

bankruptcy estate. Cadaner, Lever, and Shusterman have agreed that those claims should be dismissed without prejudice based on this Court's lack of subject matter jurisdiction.

## JURISDICTION AND VENUE

The Court has jurisdiction to hear and determine this adversary proceeding under 28 U.S.C. §§ 157(a), 157(b)(1) and 1334(b), and the Eastern District of New York Standing Order of Reference, dated August 28, 1986, as amended by the Order, dated December 5, 2012. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy Procedure. Venue of this adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11. 28 U.S.C. § 157(b)(1). Bankruptcy judges may hear, but lack subject matter jurisdiction to determine, related to proceedings absent the consent of all parties. Instead, the Court is required to submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1).

For proceedings to be core proceedings, they must be both statutorily and constitutionally core. *Stern v. Marshall*, 564 U.S. 462 (2011). Disputes concerning the allowance or disallowance of proofs of claim are statutorily and constitutionally core proceedings. *See* 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include . . . allowance or disallowance of claims against the estate . . . for the purposes of confirming a plan under chapter . . . 13 of title 11"); *Enron Corp. v. Citigroup, Inc. (In re Enron Corp.)*, 349 B.R. 108, 112 (Bankr. S.D.N.Y. 2006) ("When a creditor files a proof of claim, the bankruptcy court has core jurisdiction to determine that claim, even if it involves a pre-petition contract claim arising under state law.").

A debtor's counterclaims against a creditor that filed a proof of claim are statutorily core proceedings. *See* 11 U.S.C. § 157(b)(2)(C) ("Core proceedings include counterclaims by the

estate against persons filing claims against the estate."). A debtor's counterclaims, however, are constitutionally core only if the counterclaims are resolved in the process of determining the creditor's proof of claim. *Stern*, 564 U.S. at 518 (Bankruptcy Court lacked constitutional authority to enter final judgment on state law counterclaim not resolved in ruling on creditor's proof of claim).

Cadaner has not consented to this Court's entry of final judgment in this adversary proceeding. May 30, 2025 Hr'g Tr. 5:13-24, Adv. ECF No. 45 ("Tr. 1"). Nonetheless, the Court has subject matter jurisdiction to hear and determine Cadaner's claims against Johnson and Johnson's counterclaim against Cadaner. Cadaner filed a proof of claim asserting a claim based on Johnson's breach of the contract to sell real property to Cadaner. Johnson's counterclaim against Cadaner concerns the same contract and will be resolved in ruling on Cadaner's proof of claim. By filing a proof of claim, Cadaner subjected himself to this Court's equitable jurisdiction to determine his proof of claim and Johnson's counterclaim. *See Stern*, 564 U.S. at 518; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58 (1989); *Langenkamp v. Culp*, 498 U.S. 42 (1990); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011).

Neither Lever nor Shusterman filed proofs of claim. However, this Court has jurisdiction to hear and determine the cross claims between Lever and Shusterman and Johnson because Lever and Shusterman expressly consented to this Court's jurisdiction. Tr. 1 5:15-6:1.

## PROCEDURAL HISTORY

The State Court Action

On November 8, 2021, Cadaner commenced an action in New York Supreme Court, Kings County, captioned *Zev M. Cadaner v. Vilma Johnson, Chaya Shusterman, Eliezer Lever*, Index No. 528557/2021 (the "State Court Action"). The Complaint asserts five causes of action.

The First Cause of Action seeks declaratory judgment that the contact (the "Cadaner Contract") between Cadaner, as purchaser, and Johnson, as seller, for real property commonly known as 1708 President Street Brooklyn, New York (the "Property"), dated November 12, 2020 is valid and enforceable.  Compl. ¶¶ 11-12, Adv. ECF No. 1-1; Ex. B.  The Second Cause of Action seeks specific performance of the Cadaner Contract.  *Id*. at ¶¶ 13-15.  The Third Cause of Action seeks not less than $5 million in damages for Johnson's alleged breach of the Cadaner Contract.  *Id*. at ¶¶ 16-20.  The Fourth Cause of Action seeks the return of the $110,000 down payment plus actual, incidental and consequential damages.  *Id*. at ¶¶ 21-23.  The Fifth Cause of Action seeks monetary damages from Lever and Shusterman for tortious interference.  *Id*. at ¶¶ 24-32.

Johnson answered the Complaint by denying substantially all allegations.  Johnson's Answer and Countercl.  ¶¶ 2-31, Adv. ECF No. 7.  Johnson counterclaimed for declaratory judgment that the Cadaner Contract is void.  *Id*. at ¶¶ 35-39.  Cadaner replied to Johnson's counterclaim by denying substantially all of Johnson's allegations.  Pl.'s Reply to Countercl. ¶¶ 1-5, Adv. ECF No. 8.

Shusterman and Lever answered the Complaint denying substantially all allegations.  Lever Answer, Countercl. and Cross-Cl. ¶¶ 2-32, Adv. ECF No. 1-2.  Shusterman and Lever counterclaimed for money damages alleging Cadaner tortiously interfered with the Lever/Shusterman Contract.  *Id*. at ¶¶ 35-44.  Shusterman and Lever asserted a crossclaim against Johnson for declaratory judgment that the Lever/Shusterman Contract remains in full force and effect.  *Id*. at ¶¶ 51-57.  Shusterman and Lever also asserted cross claims against Johnson for specific performance of the Lever/Shusterman contract and damages for Johnson's alleged breach of contract.  *Id*. at ¶¶ 51-60. Johnson answered Lever and Shusterman's crossclaims.  Johnson Answer to Crosscl., Adv. ECF No. 9.

On August 31, 2022, Johnson removed the State Court Action to this Court.

The Court conducted a trial on May 30, 2024, June 10, 2024, and September 19, 2024.

## FINDINGS OF FACT

Johnson's Bankruptcy Case

1.      On May 20, 2022, Johnson filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code.  Bankr. Case ECF No. 1.[1]

2.      The last date for creditors to file proofs of claim was July 29, 2022 (the "Bar Date").  Bankr. Case ECF No. 9.

3.      On June 28, 2022, Deutsche Bank National Trust, filed Proof of Claim number 1-1, asserting a claim for $668,856.78 secured by a mortgage on the Property.  Deutsche Bank National Trust assigned the Mortgage Proof of Claim to NewRez LLC d/b/a Shellpoint Mortgage.  Deutsche Bank National Trust also filed Proof of Claim number 8-1, which is amended by Proof of Claim number 11-1, asserting an additional claim of $26,741.07, for unpaid post-petition mortgage payments.

4.      On December 6, 2023, Cadaner filed Proof of Claim number 9-1 asserting a general unsecured claim for $500,000 as rejection damages (the "Cadaner Proof of Claim").

5.      Five other creditors filed proofs of claim asserting general unsecured claims of $15,452.56 in the aggregate.  New York State Department of Taxation and Finance filed a proof of claim asserting a priority claim of $1,016.45.  Johnson's bankruptcy counsel filed proofs of claim requesting $51,785.49 in post-petition attorneys' fees.[2]

---

[1]  Citations to "Bankr. Case ECF No. __" are references to documents filed on the docket of *In re Johnson*, Case No. 22-41100-jmm.

[2]  Johnson's bankruptcy counsel filed Proofs of Claim 7, 10, and 12.  The Court assumes that Proofs of Claim 7 and 10, each asserting a claim of $39,785.49, are duplicates.

6.      Neither Lever nor Shusterman have filed a proof of claim.

7.      On June 13, 2023, Johnson filed her Third Amended Chapter 13 Plan, dated June 13, 2023 (the "Plan").  Bankr. Case ECF No. 40.

8.      The Plan requires Johnson to pay to the chapter 13 trustee $230.83 per month from May 1, 2023 through and including April 1, 2028 plus one payment of $646,833.87.  Plan Sec. 2.1.  The Plan requires Johnson to remain current on the post-petition date monthly mortgage payments on the Property.  Plan Sec. 3.1.  The Plan provides for Johnson to assume the contract to sell the Property to Lever/Shusterman and to reject the contract to sell the Property to Cadaner.  Plan Sec. 6.1.  The Plan provides for all claims to be paid in full.  Plan Sec. 5.

9.      The Plan notes that the right to purchase the Property is the subject of this Adversary Proceeding, the Property will be sold within 60 days of the resolution of this Adversary Proceeding, and the sale proceeds will be used to fund the Plan.  Plan Sec. 9.1.

10.     The Plan has not yet been confirmed.  The hearing to confirm the Plan has been adjourned from time to time.

11.     On May 3, 2024, Johnson filed an objection to the Cadaner Proof of Claim arguing the Claim should be disallowed because it was not filed prior to the Bar Date. Bankr. Case, ECF No. 48.  Cadaner responded to the claim objection.  Bankr. Case, ECF No. 53. The Court heard argument on the claim objection on May 28, 2024, and reserved decision.

Lever/Shusterman Contract

12.     In August 2020, Johnson, as seller, and Lever, as purchaser, executed a contract of sale for the Property.  Lever Ex. B (the "Lever/Shusterman Contract").

13.    Ernest E. Wilson, Esq. ("Wilson") represented Johnson and Philip Lavender, Esq. ("Lavender") represented Lever in connection with the Lever/Shusterman Contract. Lever/Shusterman Contract Sec. 15.

14.    Lever agreed to pay $1,200,000 for the Property.  The Lever/Shusterman Contract required a $120,000 downpayment with the remaining $1,080,000 to be paid at closing. Lever/Shusterman Contract Sec. 3.  Lever wired the $120,000 downpayment to Wilson.  June 10, 2024 Hr'g Tr. 112:3-12, Adv. ECF No. 46 ("Tr. 2").

15.    The Lever/Shusterman Contract provided for a closing on or about November 10, 2020 at Wilson's office.  Lever/Shusterman Contract Sec. 15.  The Lever/Shusterman Contract does not provide that "time is of the essence."

16.    Respecting liens and encumbrances on the Property, the Lever/Shusterman Contract states:

> If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments.  As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matter or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters.  Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

Lever/Shusterman Contract Sec. 20.  The Lever/Shusterman Contract also provides:

> (a)    Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as to lands, housing, building, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing.  Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b)      . . . All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

Lever/Shusterman Contract Sec. 10.

17.      The Lever/Shusterman Contract requires the parties to obtain a "special final water meter reading" no earlier than 30 days prior to closing.  Lever/Shusterman Contract AR 13.  If there is no final water meter reading, the seller may leave $5,000 in escrow.  *Id.*

18.      The Lever/Shusterman Contract is subject to a "mortgage commitment contingency" (the "Mortgage Contingency") that provides in relevant part:

(a)      The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before 60 days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or overnight mail (the "Commitment Date") of a written commitment from an Institutional Lender . . . of $960,000 for a term of at least 25-30 years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). . . .

(e)      If no Commitment is issued by the Institutional Lender on or before the Commitment Date, then . . . Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, provided that Purchaser has complied with all its obligations under this paragraph.

(f)      If this contract is canceled by Purchaser pursuant to subparagraphs [AR 7(d) or (e)], neither party shall thereafter have any further rights against, or obligations or liabilities to the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser.

Lever/Shusterman Contract AR 7.

19.      A separate Notes on Mortgage Commitment Contingency Clause attached to the Lever/Shusterman Contract explains Johnson's rights and remedies should Lever/Shusterman fail to satisfy the Mortgage Contingency and states:

This clause allows Seller to cancel if a commitment is not accepted by Purchaser by the Commitment Date, unless Purchaser timely supplies a copy of the commitment, to allow Seller the option to avoid having to wait until the scheduled date of closing to see if Purchaser will be able to close.  Seller may prefer to

cancel rather than to wait and settle for forfeiture of the downpayment if Purchaser defaults. Because of Seller's right to cancel, Purchaser may not waive this contingency clause. This clause means that Purchaser is subject to cancellation by Seller even if Purchaser is willing to risk that he/she will obtain the Commitment after the Commitment Date. Some Purchasers may not want to be subject to such cancellation by Seller.

Lever/Shusterman Contract, Notes on Mortg. Commitment Contingency Clause Sec. 7.

20.     Paragraph 25 of the Lever/Shusterman Contract, referenced in the Mortgage Contingency, addresses delivery of the Lever/Shusterman Contract and states: "Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys . . . by registered or certified mail, postage prepaid, or (b) delivered in person or by overnight courier." Lever/Shusterman Contract Sec. 25.

21.     Paragraph AR 7(k) modifies Paragraph 25 and provides that for purposes of the Mortgage Contingency, "[Lever] shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid." Lever/Shusterman Contract AR 7(k).

22.     Lavender testified that he did not know Paragraph 25's purpose but the parties had agreed to those terms respecting notice. Tr. 2 51:4-12.

23.     Wilson emailed a fully executed copy of the Lever/Shusterman Contract to Lavender on August 12, 2020. Sept. 16, 2024 Hr'g Tr. 31:6-32:10, Adv. ECF No. 47 ("Tr. 3"). Wilson did not deliver the Lever/Shusterman Contract by regular mail, registered or certified mail, overnight courier, or personal service.

24.     Lavender received a fully executed copy of the Lever/Shusterman Contract from Wilson on August 12, 2020. Tr. 2 4:21-6:10, 7:1-12, 138:9-11. Lavender testified that, upon receipt of the fully executed contract from Wilson, Lever was aware that he had to apply for a

mortgage.  Tr. 2 48:17-21.  As of October 11, 2020 (*i.e.*, sixty days after Wilson emailed the Lever/Shusterman Contract to Lavender), Lever had not received an unconditional mortgage commitment or requested from Johnson an extension of time to obtain a commitment.  Tr. 2 172:7-19.  At no point did Lever exercise his right to cancel the Lever/Shusterman Contract under subparagraph (e) of the Mortgage Contingency.

25.    On October 13, 2020 (two days after the Commitment Date), Lavender emailed a title report to Wilson and itemized conditions that needed to be addressed for the parties to close. Lever Ex. D; Tr. 2 13:10-22.  The email itemized the following requirements for closing:

a.    the Mortgage must be paid in full at closing;

b.    the attorney representing the mortgagee in the foreclosure action must provide an undertaking to discontinue the foreclosure action and vacate the judgment of foreclosure and sale and lis pendens;

c.    any other judgments and liens against the record owner must be resolved;

d.    Environmental Control Board ("ECB") liens against the property must be paid at or prior to closing;

e.    the tenant must have vacated the Property;

f.    the Housing Preservation and Development ("HPD") violations must be removed; and

g.     the open permit contained in the certificate of occupancy search must be removed.

*See* Lever Ex. D.

26.    On October 26, 2020, Lavender emailed Wilson and advised that Lever intended to assign the Lever/Shusterman Contract to Shusterman and requested Johnson execute and return the assignment to Lavender.  Lever Ex. M.

27.    Lever emailed Wilson on November 4, 2020 reiterating the issues articulated in his prior email.  Lever Ex. M.  Lavender emailed Wilson again on November 8, 2020, complaining, among other things, that Johnson violated the Lever/Shusterman Contract by

refusing to provide an appraiser with access to the Property.  Lever Ex. L.  The issue of access must have been resolved, because Lever obtained a Property appraisal that valued the Property as of November 10, 2020.  Johnson Ex. P-1.

28.     On November 9, 2020, Lavender emailed Wilson to request again that Johnson consent to an assignment of the Lever/Shusterman Contract from Lever to Shusterman.  Lever Ex. L.  The November 9, 2020 email also asked how Johnson would resolve the sidewalk violation and open permit and when the tenant would be vacating the Property.  *Id*.

29.     As set forth more fully below, on November 12, 2020, Johnson and Cadaner entered into the Cadaner Contract that included a November 30, 2020 closing date.

30.     Lavender emailed Wilson on November 18, 2020, November 20, 2020, and November 30, 2020 reiterating the concerns raised in his prior emails and noting that Wilson had not responded to his emails.  Lever Ex. L.

31.     On December 4, 2020, Lavender emailed Wilson that:

[O]ur client is willing to accept a credit for the reasonable cost of removing the violations from the property and closing out the open permit that exists filed against the Premises.  This is contingent on our client's lender agreeing to close subject to.  If they require to close with escrow, we will have to go that route.

Speaking of the Purchaser's Lender, we will require your client to sign the attached assignment of contract from "Eli Lever" to his wife "Chaya Shusterman".  Please email a copy of the attached assignment by Mr. [sic] Johnson."

Lever Ex. M.

32.     In or around December 2020, Lavender and Wilson discussed the assignment of the Lever/Shusterman Contract to Shusterman and disagreements concerning Johnson's request to remain in possession of the Property post-closing.

33.     In January 2021, Lever, Shusterman and Johnson executed an Assignment of Contract, dated as of December 2020, that assigned Lever's interests in the Lever/Shusterman

Contract to Shusterman. Tr. 2 129:6-14; Lever Ex. G.[3] The Assignment of Contract references

an amendment to the Lever/Shusterman Contract permitting Johnson to continue to occupy the

Property that is identified as Exhibit A to the Assignment of Contract. Lever Ex. G. The Court

has not been provided with Exhibit A to the Assignment of Contract. Lever testified that the

parties never resolved their disagreements regarding Johnson's post-closing possession. Tr. 2

25:18-26:21.

34.     It does not appear there was meaningful progress on closing the sale to

Lever/Shusterman or significant communication concerning the sale from February 2021 through

June 2021.

35.     By letter dated June 30, 2021, Wilson advised Lavender that the October 12, 2020

Commitment Date had expired and Lever had not provided notice that he applied for a mortgage

or requested an extension of the Commitment Date (the "TOE Letter"). Lever Ex. N. The TOE

Letter represented that Johnson was ready, willing and able to proceed to closing on July 30,

2021 at 10:00 a.m. (the "Lever/Shusterman Law Date") with time being of the essence. *Id*.

36.     By letter dated July 2, 2021, Lavender responded to the TOE Letter by asserting

that Johnson could not be ready to close because the Lever/Shusterman Contract required

Johnson:

    a.      to deliver the Property free of all violations as of the Closing and there
    were fourteen (14) HPD violations on the Property;

    b.      to close out open permits and the NYC Department of Buildings records
    reflected an open permit;

---

[3] Plaintiff's counsel objected to the admission of the Assignment into evidence claiming Lever failed to authenticate the document. Counsel claimed that Lavender testified that there were two versions of the Assignment. The Court preserved the objection until Plaintiff was able to obtain a transcript of Lavender's testimony. Tr. 2 127:4-18. Plaintiff did not raise the objection in his post-trial submissions and the objection is overruled.

c.    to provide "marketable" title and Johnson could not do so due to the ECB liens, Judgment of Foreclosure, and Notice of Pendency.

Lever Ex. O.

37.    Additionally, Lavender noted that Lever would not be obligated to close unless the representations and warranties Johnson made in the Lever/Shusterman Contract were accurate as of the closing date.  *Id*.  Lavender maintained that Johnson's representations and warranties would not be accurate because Johnson failed to close out the open permit, there was current litigation impacting the Property (*i.e.* the foreclosure action), and the HPD violations had not been cleared.  *Id*.

38.    Further, Lavender asserted that the Commitment Date had not expired because Wilson had not delivered a fully executed copy of the Lever/Shusterman Contract to Lavender in accordance with Paragraph 25 of the Lever/Shusterman Contract.  *Id*.  Paragraph 25 required delivery of the Lever/Shusterman Contract by registered or certified mail, personal delivery, or by overnight mail, and Wilson delivered the Lever/Shusterman Contract to Lavender by e-mail only.  Lever Ex. O; Tr. 2 28:4-16.

39.    On July 26, 2021, Wilson emailed Lavender and attached a letter of undertaking from the mortgagee to discontinue the foreclosure action and to cancel the *lis pendens*. Johnson Ex. CCC.  Wilson's email indicated that a mortgage payoff had been ordered.  *Id*.

40.    On the same day, Lavender responded to Wilson's email.  *Id*.  The email reminded Wilson that Johnson had to close out the open building permit, remove all violations of record, and vacate the Property.  Lavender also reminded Wilson to order a "special final water meter reading," to ensure the Property is left vacant and broom clean, to make the Property available for inspection by Lever prior to the closing, and to make the Property available again for an appraiser.  *Id*.

41.    On July 29, 2021, in anticipation of a July 30, 2021 closing, Wilson emailed a deed and tax transfer documents to Lavender. Johnson Ex. DDD. Lavender responded that same date by questioning Johnson's ability to close. *Id.*

42.    On July 29, 2021, Wilson sent a letter to Lavender reiterating that the closing was for July 30, 2021, time was of the essence, and Johnson was willing and able to deliver marketable title at closing. Lever Ex. P; *see* Tr. 3 43:22-44:7.

43.    Lavender responded by letter dated July 30, 2021. Lever Ex. Q. Lavender disputed that Johnson was ready to close and that Lever waived the mortgage contingency. *Id.* Lavender claimed that Johnson breached the Lever/Shusterman Contract by refusing to permit an appraiser to inspect the Property. *Id.* Lavender noted that Johnson had not provided a final water meeting, removed the violations, permitted Lever to inspect the Property to ensure it is vacant and in broom clean condition. *Id.* Lavender closed the letter stating that his client wished to work with Johnson to achieve a closing. *Id.*

44.    Johnson, Wilson, and the title closer appeared at Wilson's office for the July 30, 2021 closing. Tr. 3 45:17-24. Wilson testified that Johnson was ready, willing and able to close. Wilson had prepared the Property deed and "ACRIS" documents and Johnson was prepared to turn over the Property keys and to satisfy any liens or encumbrances on the Property from the sale proceeds. Tr. 3 45:17-25. Lever (but not Shusterman or Lavender) appeared for the July 30, 2021 closing. Tr. 2 131:16-132:8. Lever did not have a mortgage in place to close. Tr. 2 180:22-181:2, 174:23-25.

45.    On or about August 2, 2021, Lever and Shusterman executed a Memorandum of Assignment of contract memorializing that Lever had assigned his rights as purchaser under the Lever/Shusterman Contract to Shusterman. Plaintiff Ex. C1. Lever had obtained the

Memorandum of Assignment after learning that others may be interested in purchasing the Property.  Tr. 2 128:13-16.  On or about August 2, 2021, Lever or Shusterman caused the Memorandum of Assignment of Contract to be recorded with the Kings County Clerk.  Plaintiff Ex. C1.

46.    By letter dated August 26, 2021, Wilson again reported to Lavender that Shusterman did not appear for the July 30, 2021 closing.  Johnson Ex. FFF.  Although Lever appeared, he did not have the funds to close.  Johnson Ex. FFF; Tr. 3 47:16-25.  Wilson noted that Lever and Shusterman's failure to appear at the July 30, 2021 closing constituted a default that entitled Johnson to retain the down payment as liquidated damages.  Johnson Ex. FFF.

47.    Regarding the Mortgage Contingency, neither Lever nor Shusterman obtained an unconditional mortgage commitment.  Lever had obtained two conditional mortgage commitments.  Johnson Ex. AAA; Tr. 2 114: 2-5.  Lever testified he obtained a conditional mortgage commitment from Quontic Bank for the anticipated November 10, 2020 closing.  Tr. 2 138:12-139:12.  He applied to a different bank for a mortgage when the closing was pushed out to 2021.  *Id*. at 114:2-18.  Lever obtained a second conditional mortgage commitment from The Federal Savings Bank.  Johnson Ex. AAA.  The conditional commitment is dated July 27, 2021 and requests additional information.  *Id*.  The conditional commitment warns a closing cannot be scheduled until Lever provides the requested information.  *Id*.  Lever testified he decided to wait until the parties agreed to close before submitting all the information to the bank due to the time and effort involved in responding to the bank's requests for information.  Tr. 2 159:24-163:15

48.    Lavender testified to the effect that most, if not all, of the title defects of which he complained could have been cured at closing.  Specifically, Lavender testified his complaints respecting the mortgage lien, *lis pendens* and foreclosure action could be resolved with a payoff

letter and an undertaking from the attorney representing the mortgagee in the foreclosure action. Tr. 2 54:3-13. Lavender testified that that the judgment liens could be paid at closing or resolved with an affidavit from the seller at closing. Tr. 2 56:11–57:7. Lavender testified that the title insurance company would "insure over" the ECB violations if the ECB liens were paid at closing. Tr. 2 57:11-17. Lavender testified that Lever would have closed, notwithstanding the HPD violations and open permit "as long as [Lever] was able to get a reasonable estimate of the cost to cure the conditions that caused the HPD violation or resulting in the open permit, he would be willing to escrow a certain amount of funds to take care of it post closing." Tr. 2 58:12-16.

The Cadaner Contract

49.    The Cadaner Contract is dated November 12, 2020. Johnson Ex. K (the "Cadaner Contract"). The Cadaner Contract purchase price was $1,200,000 and required a $120,000 down payment. Cadaner Contract Secs. 1 & 3. The balance was due at closing. *Id*. at Sec. 3.

50.    Wilson represented Johnson in connection with the Cadaner Contract. Cadaner Contract Sec. 15.

51.    Siamak Darouvar ("Darouvar") represented Cadaner in connection with the Cadaner Contract. Tr. 1 82:2-6.

52.    Cadaner is on the board of a school, and he intended to purchase the Property for school use. Tr. 1 23:16-22. The school could not purchase the Property because it did not have credit and could not qualify for a mortgage. Tr. 1 32:8-12. Cadaner neither read the Cadaner Contract or any emails regarding the Property, nor did he speak to Darouvar directly; rather, Baruch Meshulavin and Mendel Hendel handled the arrangements and Cadaner signed whatever they told him to sign. Tr. 1 36:25-37:5, 40:25-41:8, 44:7-8. The Court believes that Mendel

Hendel is a Rabbi affiliated with the school and Baruch Meshulavin is also affiliated with the school.

53.    The Cadaner Contract does not include a mortgage contingency clause. *See* Cadaner Contract Sec. 8. The Cadaner Contract did not obligate Johnson to provide Property access to Cadaner to enable Cadaner to obtain a mortgage. Tr. 1 99:17-22. Nonetheless, Cadaner intended to obtain a mortgage to purchase the Property. Tr. 1 24:11. Cadaner testified that if he was unable to get a mortgage, then he intended to raise money from the community or take a "hard loan" to consummate the purchase. Tr. 1 24:13-19. Cadaner had not purchased property for the school before and had not obtained assistance from the community to purchase property in the past. Tr. 1 29:8-10 & 30:9-9-12. Cadaner did not have sufficient cash to purchase the Property. Tr. 1 14-19. Cadaner did not intend to use his money to purchase the Property, rather Cadaner expected the school to deposit funds into Cadaner's bank account to purchase the Property. Tr. 1 44:24-25 & 45:1-4. The $120,000 downpayment came from the school, not Cadaner. Tr. 1 39:5-11 & 23-25.

54.    The Cadaner Contract provides for the closing to take place at Wilson's office on or about November 30, 2020. Cadaner Contract Sec. 15. The Cadaner Contract does not make time of the essence.

55.    Cadaner and Johnson did not proceed to closing on or about November 30, 2020. Cadaner did not have the funds to close. Tr. 1 95:12-23.

56.    Darouvar claims Johnson caused the delay in closing. First, Darouvar claims Cadaner could not get a mortgage because Johnson denied Property access to the bank's appraiser. Tr. 1 84:6-8. Darouvar's testimony is not credible because on December 22, 2020,

and October 16, 2021, the Federal Savings Bank emailed Cadaner links to an appraisal report for the Property.  Johnson Ex. BB.

57.    Darouvar also claims title defects and Wilson's unresponsiveness to Darouvar's emails delayed the closing.  Tr. 1 84:11-17.  Darouvar sent several emails to Wilson requesting an undertaking from foreclosure counsel to terminate the foreclosure action and release the *lis pendens*, a mortgage payoff, and a commitment that ECB and PVB violations would be paid at closing.  Johnson Ex. Q.  Darouvar testified that Wilson did not respond to the emails.  Tr. 1 84:14-17.  Wilson's position was the title defects would have been cured at the closing and Cadaner agreed to take the Property subject to certain violations.  *See* Johnson Ex. Q.

58.    On September 27, 2021, Darouvar emailed Wilson's paralegals stating:

> Our client is ready, willing and able to close this transaction per the terms of the contract on October 11, 2021.  However, you have failed to clear the title.  As such, please address all outstanding title clearance exceptions.  Additionally, our client would like access to see that the condition of the premises is as per the contract of sale this week and we need to know when we can inspect same.

Johnson Ex. R.

59.    That same date, Wilson responded that apart from the bank's pay off letter, he was unaware of other title issues to be resolved.  Johnson Ex. R.  Wilson agreed to provide access to the Property twenty-four (24) hours prior to the closing date.  *Id*.

60.    On October 4, 2021, Darouvar emailed Wilson complaining that Johnson had not yet made the Property available for inspection.  *Id*.  On October 5, 2021, Darouvar's paralegal emailed Wilson that if Johnson would allow access to the Property on October 6, 2021, then Cadaner could close by October 11, 2021.  *Id*.

61.    Cadaner testified that, if necessary, he would have had funds to close on October 11, 2021.  Tr. 1 63:19-25.  However, Cadaner did not testify that he had a mortgage commitment, did not produce documentary evidence of an unconditional mortgage commitment, or identify

any source of funds to close. To the contrary, Cadaner testified that he had not raised funds (from the community or otherwise) to purchase the Property. Tr. 1 68:21- 69-3.

62.    Cadaner obtained a conditional mortgage commitment of $960,000 from The Federal Savings Bank on or about December 6, 2020. Johnson Ex. M; Tr. 1 96:24-97:10. However, Cadaner had no knowledge that he received any such commitment. Tr. 1 45:15-16 & 47:12-17. Cadaner had no knowledge whether he satisfied the conditions to the Federal Savings Bank conditional mortgage commitments. Tr. 1 48:19-25-49:1-9 & 50:14-25-51:1.

63.    Wilson testified that he believed the September 27, 2021 email from Darouvar scheduled a closing for October 11, 2021. Tr. 3 60:16-18. Wilson testified he was present in his office on October 11, 2021 for a closing, and Johnson was ready, willing and able to close. Tr. 3 63:22-64:2. Wilson also testified that in anticipation of a closing, he would have provided a payoff letter, including an undertaking, yet no payoff letter or undertaking has been produced. Tr. 3 71:2-11, 73:10-17, 74:23-75:12.

64.    Wilson testified that neither Cadaner nor his title closer appeared for the October 11, 2021 closing and Cadaner did not provide proof of funds available to close. Tr. 3 63:22-64:11.

65.    Wilson admitted he never communicated to Cadaner's attorneys that time was of the essence. Tr. 3 71:12-15. However, he also testified he did not believe he needed to fix a "time of the essence closing date" because Cadaner had set the closing date. Tr. 3 71:16-19. Wilson testified that the Cadaner Contract had not been terminated and is still in effect. Tr. 3 81:5-9.

66.    Darouvar testified that he never scheduled a closing. Tr. 1 110:2-8. Darouvar testified that Johnson anticipatorily breached the contract when the Memorandum of Assignment

of the Lever/Shusterman Contract was recorded. Tr. 1 110:6-14. However, he also testified that delivering a "time is of the essence" letter would be necessary to hold Johnson in breach of the Cadaner Contract and he had not delivered a "time is of the essence" letter. Tr. 1 109:21-110:1.

## DISCUSSION

### Decision Respecting Lever and Shusterman's Crossclaims Against Johnson

I.  <u>First Crossclaim against Johnson for Declaratory Judgment that the Lever/Shusterman Contract is in Full Force and Effect</u>

Johnson contends she properly terminated the Lever/Shusterman Contract because Lever and Shusterman failed to close on the Lever/Shusterman Law Date. Lever and Shusterman argue they were not required to close by the Lever/Shusterman Law Date because (a) the Commitment Date had not expired, and (b) Johnson was not an able seller due to her failure to cure title defects. Post-Trial Mem. of Law of Shusterman & Lever p. 6-7, Adv. ECF No. 53 ("Lever Post-Trial Mem. of Law").

a.  The Lever/Shusterman Contract Terminated Because Lever and Shusterman Failed to Obtain an Unconditional Mortgage Commitment

Lever and Shusterman argue that the sixty-day period to obtain a mortgage commitment has not started to run. They claim the mortgage commitment period does not start to run until a fully executed contract is delivered to their counsel by registered or certified mail, in-person delivery, or overnight courier as required by section AR 25 of the Lever/Shusterman Contract. Wilson delivered the fully executed Lever/Shusterman Contract only by e-mail.

"Under New York law, 'strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation.'" *Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 829 (2d Cir. 2015) (quoting *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 826 N.Y.S.2d 392, 395 (App. Div. 2006) (defendant did not breach stock purchase agreement by failing to give written notice of

settlement where plaintiff had actual notice of settlement and suffered no prejudice)); *see Iskalo Electric Tower LLC* v. *Stantec Consulting Services, Inc.*, 916 N.Y.S.2d 373 (App. Div. 2010) (notice to corporate counsel as opposed to chief executive officer as required by contract, was nonetheless effective); *Thor 725 8th Avenue LLC* v. *Goonetilleke*, 138 F. Supp. 3d 497, 509 (S.D.N.Y. 2015), *aff'd*, 675 Fed. App'x. 31 (2d Cir. 2017) (termination notice delivered to incorrect address was effective because contract counterparty had actual notice and there was no alleged prejudice); *DuVal Wiedmann, LLC v. InfoRocket.com, Inc.*, 620 F.3d 496, 501 (5th Cir. 2010) (notice sent to bankruptcy trustee instead of to plaintiff was effective); *Gorey v. Allion Healthcare, Inc.*, 856 N.Y.S.2d 498 (Sup. Ct. 2008) (excusing failure to mail notice to CEO and corporate counsel where employee hand-delivered notice to CEO's desk and emailed him).

*Dellicarri v. Hirschfeld*, 619 N.Y.S.2d 816 (App. Div. 1994) is instructive.  In *Dellicari*, a real estate contract vendee sued to recover the good faith downpayment because the vendee was unable to obtain a mortgage.  *Id.*  The vendor claimed that vendee could not recover the downpayment because the vendee failed to give timely and proper notice of her intention to cancel.  *Id.* at 817.  The Appellate Division rejected the vendor's contention that vendee's notice of cancellation was ineffective because it was not sent by registered or certified mail stating "[s]trict compliance with the contract's notice provisions was not required, for defendants do not claim that they did not receive actual notice or that they were in any way prejudiced as a result of this minimal deviation."  *Id.*

*Suarez v. Ingalls*, 723 N.Y.S.2d 380 (App. Div. 2001) reaches a similar conclusion.  In that case, the real property contract vendee sued for specific performance arguing that seller's notification of cancellation was ineffective because the notice was not sent by certified mail.  *Id.* at 381.  The Appellate Division rejected the vendee's argument, holding that strict compliance

with notice provisions was not required because the vendee did not claim that she did not receive actual notice and did not claim prejudice. *Id.  See Baker v. Norman*, 643 N.Y.S.2d 30, 32 (App. Div. 1996) (facsimile transmission of notice of cancellation by real property purchaser was sufficient notwithstanding contract required delivery by registered or certified mail, overnight courier, or in person); *Goldin Real Est., LLC v. Shukla*, 212 N.Y.S.3d 117, 120 (App. Div. 2024) (trial court erred in granting summary judgment to real property seller because purchaser's email notice of contract termination could have been effective if seller had actual notice and had not suffered prejudice).

Here, Wilson delivered the fully executed contract to Lavender by email, and not by registered or certified mail, personal delivery, or overnight courier.  However, Lavender acknowledged he received a fully executed copy of the Lever/Shusterman Contract from Wilson on August 11, 2020.  Tr. 2 4:21-6:10, 7:1-12, 18:9-11, 138:9-11.  Lavender testified that, upon receipt of the fully executed contract from Wilson, Lever was aware he had to apply for a mortgage.  Tr. 1 48:17-21.  Therefore, Lever had actual notice of the Lever/Shusterman Contract, the Mortgage Contingency clause, and the Commitment Date.

Upon receipt of the Lever/Shusterman Contract, Lavender ordered a title report and communicated with Wilson regarding the closing.  Lever applied for and obtained a conditional mortgage commitment.  Further, Lavender testified he did not know why the Lever/Shusterman Contract even required notice by certified or registered mail, personal delivery or overnight courier.  Lever and Shusterman do not, and could not, claim that they were prejudiced by email delivery.

Delivery of the Lever/Shusterman Contract by email was effective to trigger the Mortgage Contingency.  The deadline for Lever and Shusterman to obtain a mortgage

commitment was October 11, 2020; sixty days from Wilson's August 11, 2020 delivery of the fully executed Lever/Shusterman Contract. Lever and Shusterman had not obtained an unconditional mortgage commitment by October 11, 2020. Moreover, Lever and Shusterman had not obtained an unconditional mortgage commitment (or other source of funds for the purchase) by the July 30, 2021 Lever/Shusterman Law Date. Lever and Shusterman do not argue that Johnson agreed to extend the Commitment Date.

Lever and Shusterman could have cancelled the Lever/Shusterman Contract under the Mortgage Contingency by notifying Johnson of their inability to obtain a mortgage commitment by October 16, 2020 (*i.e.,* within five business days after the Commitment Date). However, Lever and Shusterman failed to do so. In fact, Lever and Shusterman never sent a notice of cancellation to Johnson. To the contrary, after failing to attend the July 30, 2021 closing, Lavender notified Wilson that Lever and Shusterman wanted to work with Johnson to resolve the outstanding issues.

b. <u>Lever's Failure to Close is Not Excused by Alleged Title Defaults</u>

Lever and Shusterman argue that Johnson cannot hold them in breach because Johnson was not ready, willing, and able to close on July 30, 2021, and did not prove that Lever and Shusterman did not have a lawful excuse to close. Lever's Post-Trial Mem. p. 6.

Johnson has proven by a preponderance of the evidence that she was ready, willing, and able to close on July 30, 2021. Wilson provided Lavender with an undertaking and informed Lavender a payoff letter from the mortgagee had been ordered. Sections 10 and 20 of the Lever/Shusterman Contract permit Johnson to remediate liens, violations and encumbrances at closing and to use the purchase price to pay the liens. The Lever/Shusterman Contract does not appear to require that the liens, violations and encumbrances be cleared prior to closing. Additionally, Lever offered to close notwithstanding certain outstanding violations and the open

permit, provided he could obtain marketable title and consent from the lender providing financing. Furthermore, in Lavender's testimony, he acknowledged that many of the title issues could have been cured at closing. Finally, Wilson testified that Johnson was prepared to deliver keys to the premises at closing.

Johnson has proven that Lever did not have a lawful excuse to close. Lever admitted he failed to obtain an unconditional mortgage commitment and failed to cancel the contract. He testified to the effect that he chose not to respond to his lender's requests for information because he did not want to expend the resources responding until he was sure the parties were ready to close.

*Grace v. Nappa*, 89 N.E.2d 107 (N.Y. 1979), cited by Lever is distinguishable. In that case, plaintiff/vendee delivered a $52,500 downpayment, agreed to pay $333,981.50 at closing, and to take the premises subject to a $138,518.49 mortgage. 89 N.E.2d at 108. The contract obligated defendant/vendor to provide an estoppel certificate from the mortgagee certifying the amount of unpaid principal and interest, maturity date and interest rate and included a "time of the essence" clause. *Id*. Defendant failed to produce the estoppel certificate at closing. *Id*. at 109. Defendant suggested alternatives that plaintiff rejected, and the closing was adjourned. *Id*. Plaintiff sued to recover the downpayment. *Id*.

The New York Court of Appeals held for plaintiff noting that defendant's failure to provide the estoppel certificate was a material breach excusing plaintiff's performance "since defendant did not tender performance of the substitute proposals and demand that plaintiff proceed to close title, his mere statement or offer of substitute performance was insufficient to put plaintiff in default." *Id*. at 110. In *Grace*, plaintiff purchaser appeared at the closing ready to perform and defendant seller failed to satisfy a material contact term. *Id*. In contrast, in this

case, Lever and Shusterman failed to appear for the closing, and they were not able to close because they lacked a mortgage commitment.  Lever and Shusterman assumed Johnson could not tender performance.  As they failed to appear for the closing, they did not give Johnson the opportunity to perform.

Lever and Shusterman also rely on *Klaiber, LLC v. Coon*, 851 N.Y.S.2d. 667 (App. Div. 2008).  In *Klaiber,* a husband and wife agreed to sell real property to purchaser.  851 N.Y.S.2d at 668.  Purchaser's title search uncovered judgments recorded against husband in favor of wife stemming from the sellers' divorce proceedings.  *Id*.  The closing was adjourned because the judgments had not been satisfied.  *Id*.  Thereafter, the parties were unable to schedule a closing date.  *Id*.  Months later, the purchaser cancelled the contract and requested the deposit be returned.  *Id*.  Sellers sued for specific performance arguing they were able to provide clear title as they had satisfied the judgments, albeit almost a year had passed since the scheduled closing date.  *Id*.  The court granted summary judgment in favor of purchaser directing sellers to return the downpayment.  *Id*. at 669.  *Klaiber* is distinguishable.  In that case, the purchaser was entitled to the return of the deposit because the seller could not close timely.  Here, Lever and Shusterman (purchaser), not Johnson, could not close timely.

Lever and Shusterman are not entitled to declaratory judgment that the Lever/Shusterman Contract is in full force and effect because Johnson lawfully terminated the contract after Lever and Shusterman failed to close on the Lever/Shusterman Law Date.  As Johnson lawfully terminated the Lever/Shusterman Contract, Johnson is entitled to retain the $120,000 downpayment from the Lever/Shusterman Contract.

II.    <u>Second CrossClaim By Lever and Shusterman for Specific Performance and Third CrossClaim for Breach of Contract</u>

Shusterman is not entitled to specific performance of the Lever/Shusterman Contract or money damages because, as set forth above, Johnson lawfully terminated the Lever/Shusterman Contract.

## <u>DECISION RESPECTING CADANER'S CLAIMS AND JOHNSON'S COUNTERCLAIM</u>

I.    <u>First Cause of Action for Judgment Declaring the Cadaner Contract is Valid and Enforceable</u>

a.    <u>Cadaner did not Materially Breach the Cadaner Contract</u>

Cadaner seeks declaratory judgment that the Cadaner Contract is still in full force and effect.  Pl.'s Post-Trial Brief p. 2, Adv. ECF No. 55.  Johnson argues that Cadaner materially breached the contract by failing to appear for the closing that Cadaner scheduled for October 11, 2021.  Johnson Post-Trial Mem. pp. 12-13, Adv. ECF No. 54.  Johnson claims Darouvar's September 27, 2021 email scheduled a closing for October 11, 2021.  That email states that Cadaner "is ready, willing and able to close this transaction per the terms of the contract on October 11, 2021.  However, you [Johnson] have failed to clear the title.  As such, please address all outstanding title clearance exceptions."  Johnson Ex. R.

The plain meaning of the email is that Cadaner would schedule a closing once Johnson cleared title.  Wilson testified that he responded to Darouvar's September 27, 2021 email and cleared title by providing Cadaner with a payoff letter and undertaking.  However, Wilson failed to produce a responsive email, payoff, undertaking, or any documentary evidence corroborating his testimony.  Additionally, Wilson admitted he never delivered a "time is of the essence letter" to Cadaner and believes the Cadaner Contract is still in effect.

The Court finds that Johnson has failed to prove that Wilson provided Cadaner with proof that Johnson had cleared title, Darouvar's September 27, 2021 email did not schedule a closing for October 11, 2021, and the Cadaner Contract is in full force and effect.

  b.  <u>Johnson's Rejection of the Cadaner Contract in the Plan Does Not Terminate the Cadaner Contract</u>

Johnson argues the Cadaner Contract is unenforceable because the Plan provides for rejection of the Cadaner Contract.  Johnson Reply Post-Trial Mem. p. 3, Adv. ECF No. 64. Bankruptcy Code sections 365(a) and 1322(b)(7) permit a chapter 13 debtor to assume or reject any executory contract of the debtor in a chapter 13 plan.  11 U.S.C. §§ 365(a), 1322(b)(7). Cadaner does not dispute the Cadaner Contract is an executory contract that Johnson may assume or reject.  Further, Johnson is correct that, with exceptions inapplicable here, rejection of an executory contract precludes the non-debtor contract counterparty from compelling the debtor to perform under the rejected contract. *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 386-87 (2019).

However, a chapter 13 plan must be confirmed before it is binding on the debtor and creditors.[4]  11 U.S.C. § 1327(a) ("The provisions of a confirmed plan bind the debtor and each creditor.").  Johnson's Plan has not been confirmed; therefore, the Cadaner Contract has not yet been rejected.

Plan confirmation is not a foregone conclusion.  Among other things, the Bankruptcy Code requires the court to find that a plan is feasible before the plan can be confirmed. 11 U.S.C. § 1325(a)(6).  The Plan provides for all claims to be paid in full.  At this time, Plan feasibility is uncertain due to the $500,000 Cadaner Claim.  Johnson objected to the Cadaner

---

[4] At least one court has held that under Bankruptcy Code section 365(d)(2), prior to confirmation of a chapter 13 plan, only the trustee, not the chapter 13 debtor, may assume or reject an executory contract. *In re Lucash*, 370 B.R. 664, 670 (Bankr. E.D. Va. 2007).

Claim solely on the basis that it was not filed by the Bar Date. By separate decision, the Court will overrule that objection because Rule 3002(c)(4) of the Federal Rules of Bankruptcy Procedure states that a claim arising from the rejection of an executory contract need not be filed by the chapter 13 bar date, but may be filed within such time as the Court may direct. The Court has not yet entered a bar date for rejection damages in Johnson's bankruptcy case.[5]

Further, Plan confirmation is not assured because Johnson may modify the Plan or dismiss this case. A debtor is free to modify a chapter 13 plan prior to confirmation and seek dismissal of a chapter 13 case at any time. 11 U.S.C. §§ 1323(a), 1307(b). Considering the Court's findings that Johnson lawfully terminated the Lever/Shusterman Contract, Lever and Shusterman are not entitled to damages or the return of their deposit, and considering the Cadaner Contract is in full force and effect, Johnson may choose to amend the Plan to assume the Cadaner Contract or to dismiss this case. Accordingly, there is no assurance the Plan or any chapter 13 plan will be confirmed in this bankruptcy case.

Therefore, the Court holds that the Plan's proposed rejection of the Cadaner Contract does not render the Cadaner Contract unenforceable. Cadaner is entitled to a declaration that the Cadaner Contract is in full force and effect, subject to Johnson's rights to reject the Cadaner Contract.

II.    <u>Second Cause of Action Directing Johnson to Specifically Perform the Cadaner Contract</u>

    a.   <u>Cadaner Has Failed to Satisfy His Burden To Prove He is Entitled to Specific Performance</u>

Specific performance is a remedy that is only available if (1) the seller is "able but unwilling" to convey the property on the terms set forth in the contract on the closing date, and

---

[5] The decision will preserve the rights of all parties in interest, including Johnson, to object to the Cadaner Claim on any grounds other than timeliness.

(2) the purchaser is ready, willing and able to accept the conveyance on that date. *In re Condado Plaza Acquisition LLC,* 620 B.R. 820, 835 (Bankr. S.D.N.Y. 2020). The party seeking specific performance must also prove there is no adequate remedy at law. *EMF Gen. Contr. Corp. v Bisbee*, 774 N.Y.S.2d 39, 44 (App. Div. 2004).

"When a purchaser submits no documentation or other proof to substantiate that it had the funds necessary to purchase the property, it cannot prove, as a matter of law, that it was ready, willing, and able to close." *Fridman v. Kucher*, 826 N.Y.S.2d 104, 106 (N.Y. App. Div. 2006). Additionally, a purchaser is not "ready, willing, and able to close" and is not entitled to specific performance if it refuses to close due to seller's failure to cure conditions to closing. *M&E 73-75, LLC v. 57 Fusion LLC*, 128 N.Y.S.3d 200 (App. Div. 2025) (buyer was not a willing purchaser, entitled to specific performance, when it refused to close at contract price because seller misrepresented tax classification of the property).

Cadaner is not an "able" purchaser. Cadaner's evidence that he had the money to close was his testimony that he believed he could get a mortgage, and if he was unable to obtain a mortgage, he could raise the money from his community or obtain a "hard money" loan. Cadaner produced no documentary evidence that he had been approved for a mortgage. Rather, Cadaner produced only conditional mortgage commitments. He did not know whether the conditions had been satisfied. Further, Cadaner produced no evidence he had the financial wherewithal to purchase the Property.

Cadaner is not a "willing" purchaser. As stated in the September 27, 2021 email, Cadaner was not willing to schedule a closing unless Johnson cleared titled. Additionally, Cadaner has not proven that Johnson was an "unwilling" seller because Cadaner contends he never scheduled

a closing.  In contrast, Johnson's attorney testified he appeared at the October 11, 2021 closing and was ready to convey title.

Cadaner argues that when his counsel tried to schedule a closing, Johnson's attorney was incommunicado, and then Lever and Shusterman recorded the Memorandum of Assignment of the Lever/Shusterman Contract.  As such, there was an anticipatory breach and Cadaner is entitled to specific performance.  Pl.'s 2d Post-Trial Mem. of Law p.2, Adv. ECF No. 59.  However, a buyer must show it is ready, willing, and able to perform notwithstanding repudiation of the contract by the seller.  As stated by the New York Court of Appeals:

> The rule requiring non-repudiating buyers to show their readiness, willingness and ability to perform is supported by common sense. It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach—i.e., where the transaction would have failed, and the damage would have been suffered, even if no breach occurred. The real question is one of burden of proof: Should the buyers be required to show they would and could have performed, or should the seller have the burden of showing they would not or could not? Since the buyers can more readily produce evidence of their own intentions and resources, it is reasonable to put the burden on them.

*Pesa v. Yoma Dev. Grp., Inc.*, 965 N.E.2d 228, 230–31 (N.Y. 2012).

Cadaner has failed to carry his burden of proof that he was a ready, willing, and able purchaser or that Johnson was an able but unwilling seller.  As such, Cadaner is not entitled to specific performance.

> ### b. If the Plan is Confirmed and the Cadaner Contract is Rejected, Cadaner Would Not Be Entitled to Specific Performance

Rejection of an executory contract constitutes a breach of the contract as of the date immediately before the petition date.  11 U.S.C. § 365(g)(1).  Upon rejection, the non-debtor counterparty to the rejected contract has a claim against the bankruptcy estate for damages resulting from the debtor's nonperformance.  *Mission Product Holdings, Inc.*, 587 U.S. at 374; *see also* 11 U.S.C. § 502(g)(1) ("A claim arising from the rejection, under section 365 of this title

or under a plan under chapter . . . 13 of this title, of an executory contract . . . shall be allowed . . . or disallowed . . . the same as if such claim had arisen before the date of the filing of the petition.")[6]

Bankruptcy Code section 365(i) entitles the non-debtor purchaser under a rejected contract for the sale of real property to specific performance only if the purchaser is in possession of the real property.  11 U.S.C. § 365(i).  Cadaner is not in possession of the Property.

Accordingly, if the Plan is confirmed or Johnson confirms an amended Plan providing for rejection of the Cadaner Contract, Cadaner would not be entitled to specific performance.  If Johnson confirms a chapter 13 plan that assumes the Cadaner Contract, then Johnson and Cadaner will have the rights and remedies available to them under the Cadaner Contract and applicable non-bankruptcy law, including the right to set a time of the essence closing date and to assert claims against each other if Johnson or Cadaner breaches the Cadaner Contract.

III.    Third Cause of Action – Claim for $5,000,000 in Damages and Fourth Cause of Action – Claim for return of $110,000[7] Downpayment

Cadaner claims he is entitled to $5,000,000 in damages for Johnson's breach of the Cadaner Contract plus the return of the Cadaner Downpayment.

> The appropriate measure of damages for rejection of an executory contract is determined with reference to state law.  In New York, damages for the breach of a contract for the purchase of real property are measured as the difference between the contract price and the market value at the time of the breach, or "loss of bargain" damages, together with other expenses necessarily incurred in reliance on the contract.

*In re Urban*, 202 B.R. 565, 571 (Bankr. S.D.N.Y. 1994).

---

[6]  Additionally, Cadaner could be entitled to a lien on the Property as security for his claim for the return of the good faith deposit.  11 U.S.C. § 365(j).

[7]  The Complaint alleges the Downpayment is $110,000; however, Cadaner testified the Downpayment is $120,000.  *See* Compl. ¶ 4; *but see* Tr. 1 24:3-5.

Cadaner has failed to satisfy his burden of proof that he suffered damages related to Johnson's alleged breach because he produced no evidence of the value of the Property at the time of the breach.

More importantly, as stated above, Cadaner has not proven that Johnson breached the Cadaner Contract at all.  Cadaner alleges that Johnson breached the Cadaner Contract by failing to close.  Compl. ¶¶19 & 20.  At trial, Darouvar testified that he neither scheduled a closing nor delivered a "time was of the essence" letter.  Johnson cannot be in breach by failing to close if neither party scheduled a closing.

Cadaner also argues there was an anticipatory breach of the Cadaner Contract because Lever and Shusterman recorded the Memorandum of Assignment of the Lever/Shusterman Contract.  Cadaner cites no law supporting his position.  As set forth above, assuming Johnson anticipatorily breached the contract, Cadaner still would not be entitled to damages absent a showing that Cadaner was ready, willing and able to perform.  Cadaner has not made that showing.

Cadaner could be entitled to damages for breach of contract and a refund of his down payment if Johnson rejects the Cadaner Contract or assumes the Cadaner Contract and is unwilling or unable to perform under the Cadaner Contract.  However, as set forth above, Johnson has the right to assume or reject the Cadaner Contract until confirmation of a chapter 13 plan.[8]  Accordingly, a determination of Cadaner's hypothetical damage claim is premature.  For the same reasons, it is premature to determine whether Cadaner is entitled to his down payment.  Those issues should be determined as part of the hearing on confirmation of Johnson's chapter

---

[8]  A chapter 13 debtor has until confirmation to assume or reject an executory contract, the non-debtor contract counterparty may request the Court to set an earlier date.  11 U.S.C. § 365(d)(2).  Cadaner has not made such request.

13 plan or as part of the claims allowance process if Johnson objects to the Cadaner Claim on grounds other than timeliness.

For those reasons, Cadaner's claims for damages and the return of the Cadaner Downpayment are denied without prejudice to renew if Johnson confirms a chapter 13 plan rejecting the Cadaner Contract.

## **CONCLUSION**

For the reasons set forth herein:

i. Judgment is granted in favor of Cadaner on his First Cause of Action seeking declaratory judgment that the Cadaner Contract is valid and enforceable, subject to Johnson's rights to reject the Cadaner Contract.

ii. Cadaner's Second Cause of Action seeking specific performance of the Cadaner Contract is dismissed, with prejudice to renew if (a) Johnson assumes the Cadaner Contract but fails to close; or (b) Johnson's bankruptcy case is dismissed prior to confirmation of a chapter 13 plan.

iii. Cadaner's Third Cause of Action seeking monetary damages from Johnson for breach of the Cadaner Contract and Fourth Cause of Action seeking the return of the $110,000 down payment on the Cadaner Contract are dismissed without prejudice. The Court will consider those causes of action in connection with a determination of the allowed amount of the Cadaner Proof of Claim if Johnson confirms a chapter 13 plan that rejects the Cadaner Contract.

iv. Cadaner's Fifth Cause of Action seeking monetary damages from Shusterman and Lever for tortious interference is dismissed, without prejudice, based on this Court's lack of subject matter jurisdiction.

v. Lever and Shusterman's First Counterclaim against Cadaner for tortious interference is dismissed, without prejudice, based on this Court's lack of subject matter jurisdiction.

vi. Lever and Shusterman's First Crossclaim against Johnson for declaratory judgment that the Lever/Shusterman Contract is in full force and effect is dismissed with prejudice.

vii. Lever and Shusterman's Second Crossclaim against Johnson for specific performance of the Lever/Shusterman Contract is dismissed with prejudice.

viii. Lever and Shusterman's Third Crossclaim against Johnson for money damages for breach of the Lever/Shusterman Contract is dismissed with prejudice.

ix. Johnson's First Counterclaim against Cadaner for declaratory judgment that she is entitled to retain Cadaner's $110,000 down payment is denied without prejudice. The Court will consider Johnson's entitlement to retain the downpayment in connection with a determination of the Cadaner Proof of Claim.

x. This decision and any judgment memorializing this decision shall survive conversion or dismissal of Johnson's bankruptcy case.

Johnson is directed to submit a judgment conforming to this decision within fourteen (14) days of entry of this memorandum.



Dated: June 13, 2025
    Brooklyn, New York

Jil Mazer-Marino
United States Bankruptcy Judge